**Joseph L. COREY, Jr.,**
**Plaintiff-Appellant,**

v.

**Allen M. LOOK et al.,**
**Defendants-Appellees.**

**No. 80–1447.**

United States Court of Appeals,
First Circuit.

Argued Nov. 5, 1980.

Decided Feb. 13, 1981.

As Amended March 2, 1981.

Herbert N. Goodwin, Boston, Mass., for appellant.

Peter B. Ellis, Boston, Mass., with whom Laurence S. Fordham, Dinah Seiver, and Foley, Hoag & Eliot, Boston, Mass., were on brief for appellee The Woods Hole, Martha's Vineyard and Nantucket Steamship Authority.

Edward W. Farrell, Falmouth, Mass., for appellee Town of Falmouth, Massachusetts, submitting on brief of other appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

This antitrust suit requires us to review a district court dismissal of a complaint on the alternative grounds of failure to state a claim and of defendants' immunity by reason of the state action exemption. We conclude that, under the rigorous standard of review governing us in this appeal, dismissal of the complaint was unwarranted.

I

Appellant sued the town of Falmouth, Massachusetts ("Town") and the Woods Hole, Martha's Vineyard and Nantucket Steamship Authority ("Authority") in April 1977. His complaint, viewed favorably, alleged the following. In March, 1974, the Authority terminated appellant's contract as a parking lot operator. The following month the Town publicly put a town lot formerly leased by the Authority up for open lease negotiations. Appellant sought to lease the lot, and provided the Town with parking lot revenue information that it promised it would keep confidential. However, the Authority as parking operator/land consumer conspired with the Town as land supplier to eliminate appellant as a competitor in the parking supply market. This was evidenced by the Town's favoritism to the Authority: the Town told the Authority about the confidential information, and it allowed the Authority to use the lot prior to any formal lease. The conspiracy was also shown in the conduct of the lease negotiations. The Authority initially sought to match each of appellant's offers for the lot, but eventually it abandoned this effort. Consequently appellant's final offer was more attractive than the Authority's. During the negotiations, a representative of the Authority met with the Town to inform it that it had to accept the Authority's offer. In a decision without an objective or rational foundation the Town awarded the lease contract to the Authority. After rejecting appellant's attempt to lease the town lot and thus compete as a parking supplier, the Town continued to attack appellant when he attempted to compete by using another lot located in Falmouth. The complaint did not elaborate on the factual basis for the claimed later attack.[1]

The Authority and the Town each answered after obtaining extensions of time. The defendants then propounded interrogatories to appellant, which he answered after several extensions of time. His answers claimed that the Town had refused appellant's requests that the negotiations proceed by sealed public bid. They also elaborated on appellant's post-lease attempts to compete. Appellant stated that when he leased a lot from Penn Central Railway, the Town had required him to obtain a special permit for parking operation. He said that it had not required the Authority to obtain such a permit when the Authority had previously leased this very lot. The permit requirement assertedly injured appellant by its delay in issuance and by its two special restrictions: it barred appellant from advertising by sign and it severely restricted the times at which appellant was allowed to charge customers using his facilities.[2] Ap-

---

1. In addition to the above antitrust claim, the complaint also contained a claim under 42 U.S.C. § 1983 that is no longer in issue.

2. Appellant answered that "[a] further restriction provided that the plaintiff's lot would be

open without charge from 6:00 a. m. to 8:00 p. m., seven days a week. [Appellant] was permitted to charge a parking fee from 9:00 p. m. to 12:00 a. m., Friday and Saturday nights only."

pellant further claimed that these requirements had never been applied to the Authority when it had leased this lot.

In addition to requiring the special permit, appellant's answers asserted that the Town blocked access to appellant's lot at peak times, and the Authority used appellant's lot without permission or compensation when parking overflowed its own lots. The Town refused to act when appellant requested aid against the Authority's trespasses and appellant was driven out of business.

The Authority moved for 12(b)(6) dismissal in September, 1978. The Town followed suit in February, 1979. Appellant moved for an enlargement of time, citing the complexity of the issues and the hospitalization of his lawyer's mother. Several further delaying motions were made and granted. Briefing on the motions was completed in April, 1979. In December, 1979, appellant moved to amend his complaint to add facts from his interrogatory responses. The amendments further claimed that the Town had allowed the Authority to park cars on school-owned property but had denied appellant similar rights; that the Town had violated the law when it refused to put the contract to public bid; and that the Authority had increased all parking fees after the appellant was forced out of business. The district court held a hearing in January, 1980, and the next day the appellees filed a one-sentence opposition to appellant's motion to amend. They claimed the amendment was untimely and irrelevant, but asserted no prejudice from delay.

In March, 1980, the district court granted judgment for the defendants. It dismissed appellant's antitrust claim on alternate grounds: failure to state a claim and state action immunity. It did not refer to appellant's pending motion to amend his complaint.

Appellant then moved under Rule 59 to alter the judgment to allow him to amend his complaint. The court "denied [the motion] by reason of the fact that the proposed amendment would make no difference in the outcome of the case". The court gave no other reason for its decision. Appellant appealed from the denial of the Rule 59 motion, but not from the earlier adverse judgment.

## II

Both appellees' motion to dismiss the original complaint and appellant's motion to amend that complaint were simultaneously before the district court when it first ruled. Although the court dealt with these matters at different times, the justification for the latter decision necessarily implicated the correctness of the former. In addition, the court evidently intended that its two holdings be considered jointly since it handled the amendment motion so as to preserve for appellant an "ample record for the Court of Appeals." We thus treat this appeal as concerning both of the district court's actions.

## A

The district court held that the simple fact that the appellant lost in the competition for an exclusive contract meant that the complaint did not state an antitrust claim. This reading of the complaint emphasizes the innocuous and ignores the ominous. Appellant's claims are not confined to the plaints of one whose bid was not good enough to dominate the auction. *See Klor's v. Broadway-Hale Stores,* 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959) (distinguishing classic boycott from exclusive dealership and from single trader's refusal to deal).[3] Nor do they depict the case of governmental bodies choosing to avoid the marketplace altogether and allocate resources according to some other decision mechanism. Rather they assert

---

**3.** Had this case been simply that of an exclusive dealership, *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283, 287 (6th Cir. 1963), or the refusal of a single trader to deal with others, *Donovan v. Pennsylvania Co.,* 199 U.S. 279, 295, 26 S.Ct. 91, 94, 50 L.Ed. 192 (1905); *Murdoch v. City of Jacksonville,* 361 F.Supp. 1083, 1087–89 (M.D.Fla.1973), the authorities upon which the district court relied would have been apposite.

that the Authority—appellant's competitor in the parking service market—acted in concert with the Town—a supplier of parking lot space—to deprive the appellant of access to supplies crucial to a parking operation: parking lot space. The two allegedly accomplished this by subverting normal commercial bidding to exclude appellant and by hampering through severe regulations his ability to use land he obtained from other suppliers. All this is said to have been undertaken in order to eliminate appellant as a competitor. On its face, this amounts to "a 'concerted refusal to deal' with a disfavored purchaser or seller." *Barry v. St. Paul Fire & Marine Insurance Co.*, 555 F.2d 3, 7 (1st Cir. 1977), *aff'd sub nom. St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). Although not all activity that might be described as a boycott is *per se* illegal, 555 F.2d at 8 n. 4, nothing in appellant's complaint would confine appellees' behavior to a "benign", *id.*, category.[4]

The district court's reliance on *Parmalee Transportation Co. v. Keeshin*, 292 F.2d 794 (7th Cir.), *cert. denied*, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961), for the proposition that losing out in a competition among lease proposals does not constitute a violation of the Sherman Act merits some comment beyond pointing out the overlooked and ominous portions of the complaint. In *Parmalee*, a provider of transfer services between railroad terminals alleged that a competitor, Keeshin, bribed the then chairman of the Interstate Commerce Commis-

sion to pressure a group of railroads to accept Keeshin's contract proposal. A divided panel of the court affirmed a dismissal of the complaint for failure to state a Sherman Act claim. Its twin pillars, which in retrospect seem inapposite, were *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), involving a strike by organized labor,[5] and *Eastern Railroad Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), involving railroad lobbying against truckers to obtain favorable legislation. While we see little similarity between the actions in *Parmalee* and "political activity", 365 U.S. at 137, 81 S.Ct. at 529, or the "right to petition", *id.* at 138, 81 S.Ct. at 530, we see none at all in the case at bar.[6]

We need not decide whether additional federal antitrust counts may be stated by the complaint since this error alone mandates reversal.

B

The district court also erred in concluding that the alleged actions of the Authority and the Town were exempt from the antitrust laws. Appellees must meet two standards before they can claim state action exemption: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." *California Retail Liquor Dealers Ass'n v. Midcal Alumi-*

---

**4.** As in *Klor's v. Broadway-Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), the plaintiff in this case claims that a single competitor conspired with individuals at an adjacent level of economic activity to sever his essential lines of supply. The fact that *Klor's* involved many suppliers while this case involves but one—the Town—is not key. *See* L. Sullivan, Antitrust 231 n.1 (1977). This is especially the case when the single supplier of parking space has the legal power to impose restrictions on parking service suppliers.

**5.** *Apex*, which decided whether a strike violated the Sherman Act, previously had been recognized as confined to the peculiar problem of the relationship between organized labor and the antitrust laws. *See Klor's*, 359 U.S. at 213 n. 7, 79 S.Ct. at 710 n. 7. This same observa-

tion applies to *Hunt v. Crumboch*, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945), also cited in *Parmalee*.

**6.** *Cf. George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25 (1st Cir.), *cert. denied*, 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970) (*Noerr* doctrine "does not extend to efforts to sell products to public officials acting under competitive bidding statutes"). *Accord*, Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the* Noerr-Pennington *Doctrine*, 45 U.Chi.L.Rev. 80, 117 (1977); Note, Whitten v. Paddock: *The Sherman Act and the "Government Action" Immunity Reconsidered*, 71 Colum.L.Rev. 140, 148–56 (1971).

*num, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). State political subdivisions like the appellees must meet these tests by reference to state statutes showing the state "legislature contemplated the kind of action complained of." *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 415, 98 S.Ct. 1123, 1138, 55 L.Ed.2d 364 (1978). Although "specific, detailed legislative authorization" is "not . . . necessarily" required, *id.*, at 415, 98 S.Ct. at 1138, we think that, absent explicit language, the political subdivision claiming exemption must illustrate the requisite state legislative intent by demonstrating by convincing reasoning that the challenged restraint is necessary to the successful operation of the legislative scheme that the state as sovereign has established.[7]

■ Here "the kind of action complained of" is a boycott of a parking operator. Neither appellee can satisfy either *Midcal* test regarding this activity. The Authority has the power to license new entrants to the ferry market that operate ships above a certain size, with certain exceptions. Mass. Gen.Laws Ann. ch. 159 App., § 2–5 (West Supp.1980–81). Appellant's complaint alleges some ferry competition does in fact exist—a claim that is consistent with the statutory language and that the Authority does not controvert before us. Assuming that the statute serves a proper state purpose, a matter not in dispute, the Authority does not argue and we perceive no reason why a monopoly in the parking market is necessary to a system of ferry service that sanctions limited competition. The Author-

ity argues that its legislation allows it to purchase and operate parking lots. We do not doubt this. *See* Mass.Gen.Laws Ann. ch. 159 App., §§ 2–1 & 2–4 (1970). But this simply empowers the Authority to behave as an ordinary competitive economic agent; we see no necessary anticompetitive implication. This conclusion is fortified by the fact that the Authority has been granted no powers of eminent domain. *Ballantine v. Falmouth*, 363 Mass. 760, 762, 298 N.E.2d 695, 697 (1973).

■ Even had the Authority been granted the statutory power to monopolize the parking market, this would not necessarily exempt all means to achieve this end. For instance, simply because one can enforce zoning laws does not necessarily mean that one can burn down a neighbor's offending building. Thus the Authority cannot establish that there is a "clearly articulated and affirmatively expressed" sovereign state policy favoring the Authority's boycott of competitors in the parking market. Nor does the Authority suggest any statutory provision satisfying *Midcal's* second " 'actively supervised' by the State itself" test. Our limited research discloses none.

As for the Town, it too has failed to suggest statutory provisions bearing resemblance to either *Midcal* standard. Again, our limited research reveals neither legislative suggestions that otherwise illegal means are necessary to the operation of a sovereign state statutory scheme nor provisions for the state review of such a process.[8]

---

7. Not every state legislative utterance will qualify automatically as a "sovereign" act, *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975), that is, an act conferring immunity from the federal antitrust laws, since "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *California Retail Liquor Dealer Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 104, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980), quoting *Parker v. Brown*, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943).

To the extent that our pre-*Lafayette*, pre-*Midcal* cases discussing the state action exemption, `e. g., E. W. Wiggins Airways, Inc. v. Mas-

sachusetts Port Authority*, 362 F.2d 52, 55–56 (1st Cir. 1966), *cert. denied*, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1967); *George R. Whitten, Jr. v. Paddock Pool Builders, Inc.*, 424 F.2d 25, 30–31 (1st Cir.) (citing *Wiggins*), *cert. denied*, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1967), can be read to differ with the analysis in this case, they can no longer be controlling on this issue.

8. That the Town may regulate parking, Mass. Gen.Laws Ann. ch. 40, § 22 (West Supp. 1980–1981); *Commonwealth v. Dobbins*, 344 Mass. 272, 274, 182 N.E.2d 123, (1962), *see* Mass.Gen. Laws Ann. ch. 40A, § 3 (West 1979), and, like the Authority, operate parking lots, *Ballantine v. Falmouth*, 363 Mass. at 763–67, 298 N.E.2d

The district court thus erred in deciding to dismiss the complaint and to bar amendment for the reasons it stated.

### III

Appellees propose three other grounds—not alluded to by the district court—to uphold its result. We find none of these suggested paths open to us.

■ Appellees advocate that we affirm since appellant's attempt to amend was untimely. Appellant concededly was not swift in prosecuting this suit. His motion to amend came 15 months after the Authority's motion to dismiss. But the appellees also had requested time extensions in the course of the suit. They apparently also had assented to all of appellant's motions for enlargement of time. Much of the suit's delay can be attributed to completion of the discovery that the appellees initiated. They do not and apparently cannot allege prejudice from the delay; appellant's amendments simply sought to incorporate facts in the complaint that appellees had already discovered from their interrogatories. Absent a discretionary judgment by the district court and given the liberal rule favoring amendment, Fed.R.Civ.Proc. 15(a), we cannot hold as a matter of law that a trial court under these circumstances would abuse its discretion by permitting amendment.

■ Appellees' jurisdictional argument fails in claiming that here there is no effect on interstate commerce. Appellant's amended complaint asserted that 75–85 percent of the cars parking in the lots serving the Authority are from out of state, and that parking rates are "considerably" higher as a result of the absence of competition. At this stage of factual development, we believe this situation " 'as a matter of practical economics' [has] . . . a not insubstantial effect on the interstate commerce involved." *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 245, 100 S.Ct. 502, 510, 62 L.Ed.2d 441 (1980).[9]

■ Finally, we are not persuaded by appellees' assertion that appellant's complaint deserves dismissal for its conclusory nature. "There is no special rule requiring more factual specificity in antitrust pleadings." *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980). Appellant's complaints are adequate though perhaps roughhewn works of notice pleading.[10]

We therefore reverse the district court's decisions. This holding does not win the case for appellant, of course. It merely allows him to try to support his allegations. Appellant must prove his assertions to be true—especially with respect to the claim that anticompetitive design and not some more innocent motivation explains the alleged acts that are claimed to constitute the boycott here. *See Allied International, Inc. v. International Longshoremen's Association, AFL–CIO*, 640 F.2d 1368 (1st Cir. 1981).

*Reversed and remanded for further proceedings consistent with this opinion.*

at 696, does not satisfy *Midcal's* standards with respect to a boycott charge.

9. Appellees' related argument that the acts in question are not "trade or commerce" because they are nonprofit is more properly addressed to the state action exemption claim—a point that we have already determined against the appellees in Part IIB of this opinion.

10. "With the greater leniency toward pleading in antitrust cases, more emphasis has been placed on other provisions of the federal rules in order to deal effectively with the complexities of these actions. If more information is needed to prepare a responsive pleading, defendant may resort to the motion for a more definite statement. To prepare adequately for trial, defendant has available the extensive discovery procedures in Rules 26 through 37. Summary judgment can be utilized against unwarranted actions and the pretrial conference can be used advantageously to define and shape the issues for trial, thereby eliminating costly delays and surprise. All of these procedures are adaptable to the particular needs of antitrust litigation and should be employed. There is no reason for the courts to revert to the technical concepts of pleading that existed prior to the adoption of the federal rules in order to solve the inherent difficulties of antitrust action." 5 C. Wright & A. Miller, Federal Practice & Procedure 1228 at 170 (1969).