Pursuant to the Memorandum filed herein this day,

**IT IS HEREBY ORDERED** that plaintiff's motion for partial summary judgment be and is granted in part and denied in part.

First, it is granted with respect to defendants' following affirmative defenses: 1) failure to comply with the PMPA; 2) lack of actual damages; 3) statute of limitations; 4) laches; and 5) release. Second, it is also granted with respect to the substantive merits of plaintiff's complaint and this Court holds that: 1) the PMPA was applicable to the JSC and the leases and sub-leases; 2) termination of the JSC resulted in termination of the leases and sub-leases; and 3) APMI violated the PMPA by not offering the prime leases to Midwest. It is denied with respect to API's affirmative defense of lack of personal jurisdiction and API is dismissed from this case. It is also denied with respect to APMI's affirmative defense of waiver. Further, this Court rejects Midwest's argument that APMI *per se* violated the DOE Consent Order and the contract created pursuant thereto by the facts that API was not the payor of the

Consent Order payments and that rent allegedly due was deducted from the amount of said payments. Midwest is not entitled to partial summary judgment on APMI's counterclaims or Midwest's right to a refund of the amounts withheld from its DOE Consent Order payments, because the outcome of those issues turns on whether Midwest waived its right to assert that the leases and sub-leases were terminated.

**JEFFERSON DISPOSAL COMPANY, INC.**

v.

**PARISH OF JEFFERSON, LOUISIANA and Patrick J. Koloski, in his capacity as Director of the Solid Waste Management Department, Parish of Jefferson, Louisiana.**

Civ. A. No. 83–5487.

United States District Court, E.D. Louisiana.

March 5, 1985.

Ernest E. Barrow, II, of Grant & Barrow, Gretna, La., Richard J. Conway, Garret G. Rasmussen and Michael G. Plantamura of Patton, Boggs & Blow, Washington, D.C., for plaintiff.

Charles W. Lane, III, George P. Manson, Jr., of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., Hubert A. Vondenstein, Parish Atty., Gretna, La., for defendants.

## OPINION

FELDMAN, District Judge.

This is an antitrust suit against a local government, the Parish of Jefferson, a subdivision of the State of Louisiana, and a local official, Patrick Koloski, in his capacity as the Director of the Solid Waste Management Department of the Parish of Jefferson.[1] In November 1983, the Plaintiff, Jefferson Disposal Company, Inc. ("JDC"), a private corporation, instituted this suit against the Defendants. JDC alleges that the Defendants have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. sections 1 & 2, and seeks treble damages in an amount exceeding $6,000,000 under Section 4 of the Clayton Act, 15 U.S.C. section 15.[2]

---

1. In January 1985, more than a year after this suit was filed, the Plaintiff amended its complaint. It is unclear whether the Plaintiff, by way of the amended complaint, voluntarily dismissed Patrick Koloski as a Defendant from this case. However, in order to fully dispose of the motion, the Court will treat Mr. Koloski as if he were a Defendant here.

2. JDC also claims that the Defendants violated the Louisiana antitrust laws, La.Rev.Stat.Ann. 51:122 & 51:123 (West 1965), and the Civil Rights Act of 1871, 42 U.S.C. section 1983. These claims are not affected by this opinion.

JDC is engaged in the business of municipal solid waste collection and disposal and has previously performed such services for Jefferson Parish under contracts relating to the unincorporated areas of the Parish. Jefferson Parish, pursuant to the express and implied powers granted to it by its Home Rule Charter, provides garbage collection and disposal services in the Parish. To fulfill this governmental function, it created the Solid Waste Management Department of Jefferson Parish, which has direct administrative supervision over solid waste management for the Parish. In January 1981, Patrick Koloski became the Director of the Waste Management Department. As Director, he is responsible for the preparation of bid specifications and the evaluation of bid proposals and contracts relating to solid waste collection and disposal for the various Garbage Districts in the Parish. The Parish Council, however, approves the award of such contracts.

The Plaintiff claims that the Defendants engaged in concerted action with American Waste and Pollution Control Company,[3] another private company and a competitor of JDC, to restrain trade in the market for the collection and disposal of municipal solid waste in Jefferson Parish in violation of section 1 of the Sherman Act. According to the Plaintiff, in November 1981, Mr. Koloski and his Waste Management Department prepared bid specifications for the collection and disposal of municipal solid waste within Garbage Districts Two and Six on the West Bank of Jefferson Parish; Plaintiff says that the specifications were intentionally designed to favor American Waste and discriminate against JDC; the specifications, Plaintiff charges, purposefully contained unreasonable and unnecessary requirements preventing JDC from submitting a competitive responsive bid.[4] JDC also claims that Jefferson Parish has attempted to monopolize and in fact monopolized the market for garbage disposal on the West Bank of the Parish in violation of Section 2 of the Sherman Act by requiring that all municipal solid waste collected from Garbage Districts Two and Six be disposed of only in a Parish-owned sanitary landfill tract.

In January 1985, the Defendants moved to dismiss Plaintiff's claim for monetary damages, interest, costs and attorney's fees for Sherman Act violations on the ground that the Local Government Antitrust Act of 1984, Pub.L. No. 98–544, 98 Stat. 2750 (1984), prohibits the Plaintiff from obtaining such relief from a local government and its officials.

Section 3(a) of the Local Government Antitrust Act of 1984 ("Act"), which became effective as of September 24, 1984, states that "[n]o damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A or 4C of the Clayton Act (15 U.S.C. 15, 15a or 15c) from any local government, or official or employee thereof acting in an official capacity." JDC does not dispute that Jefferson Parish is a "local government" as defined by Section 2(1)(A) of the Act and that Patrick Koloski is being sued as an official of the Parish for acts performed in his official capacity as the Director of the Waste Management Department of the Parish. JDC,

---

**3.** Neither American Waste nor its parent corporation, Waste Management, Inc., were named as defendants in this action. Furthermore, JDC has not sought damages or any other relief from American Waste in any other proceeding. It is interesting to note, however, that American Waste was identified as a co-conspirator with Jefferson Parish and Koloski in the Plaintiff's unamended complaint. In its amended complaint, JDC dropped the charge of co-conspirator but maintained that the Defendants engaged in concerted action with American Waste to restrain competition.

**4.** In December 1981, five firms submitted bids for the contract for the collection and disposal of solid waste for Garbage Districts Two and Six on the West Bank of Jefferson Parish. JDC submitted the third lowest bid. American Waste was the lowest bidder. The Parish Council approved the contract award by resolution in January 1982. American Waste began to perform the contract in June 1982. JDC also contends that the contract between the Parish and American Waste is a long-term exclusive dealing agreement which unreasonably forecloses competition in the market. The contract has an initial five year term with a provision for extensions of up to five more years.

however, strongly contests the retroactive application of the Act to its pending case against the Defendants.

A brief background sketch of the dilemma local governments were in before passage of the Act will help to highlight the serious public policy questions the Act tries to resolve. Public policy questions which are central to the present motion to dismiss.

The Act represents a logical extension of the well-known doctrine enshrined in antitrust dogma in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) that insulated state action from antitrust inquiry. *Parker v. Brown* and its progeny reflect a vital and important public policy, but for years local governments were still left open to the threat of bankruptcy from Federal antitrust treble damage awards. Although states were free to conduct operations which might otherwise be open to antitrust challenges, the same conduct by local governments was not similarly emancipated unless it was authorized by specific state legislation. *See Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). *Boulder* spawned an avalanche of antitrust suits against local governments; the spectre of treble damages numbering in the multi-millions of dollars threatened the financial life of many cities and counties. Against that setting, Congress began to examine various proposals for legislative relief. In early October 1984, a compromise bill was enacted which exempts local governments only from the damages provisions of the antitrust laws; parties may still seek injunctive relief. Thus, the Act is a clear affirmation of the strong and judicially sanctioned public policy against subjecting governmental agencies and their officials to the chilling financial threat of antitrust damages.

The question here is whether the Act should be applied retroactively and, if so, whether constitutional infirmaties are triggered.

Congress was aware that plaintiffs would question the retroactive application of the Act and addressed this problem in Section 3(b) of the Act. It provided the following guidelines for Federal courts to apply:

> Subsection (a) shall not apply to cases commenced before the effective date of this Act [September 24, 1984] unless the defendant establishes and the court determines, in light of all the circumstances, including the stage of litigation and the availability of alternative relief under the Clayton Act, that it would be inequitable not to apply this subsection to a pending case. In consideration of this section, existence of a jury verdict, district court judgment, or any stage of litigation subsequent thereto, shall be deemed to be prima facie evidence that subsection (a) shall not apply.

This case has not passed the pre-trial discovery stage of litigation. Thus, the question presented is whether, in light of all the circumstances, including the stage of litigation and the availability of alternative relief, it would be inequitable for this Court to allow JDC to proceed against Jefferson Parish and Patrick Koloski for monetary damages under the Clayton Act.

This Court holds that it would, indeed, be inequitable not to apply Section 3(a) of the Act here. Furthermore, retroactive application of the Act does not violate JDC's rights under the Constitution. Finally, while the Court is not insensitive to the fact the JDC has dedicated sizable resources to pursue this litigation in the hope of receiving a treble damage award for Federal antitrust law violations, it is important to underscore that the national concern expressed by the Act in protecting local governments and their citizens from the potentially devastating effects of such awards deserves paramount consideration.

*Legislative Intent*

The legislative history of the Local Government Antitrust Act reflects Congress' deep concern over the increasing number of Federal antitrust suits against local governments arising after two recent Supreme Court opinions restricted the availability of antitrust immunity to local

governments. In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Supreme Court held that "state action" immunity established in *Parker v. Brown* did not automatically extend to local governments; rather, according to the Court, local government antitrust immunity is dependent upon whether the conduct alleged to be anticompetitive was performed pursuant to a state policy to displace competition with regulation or monopoly public service. Then, in *Boulder* the Supreme Court held that a state's grant of homerule powers to a local government was insufficient authorization by the state to cloak the local government with antitrust immunity. The *Boulder* Court explained that in order for the action of a local government to constitute the action of the state itself the local government's action had to be in furtherance or implementation of a " 'clearly articulated and affirmative expressed,' " state policy. 455 U.S. at 51, 102 S.Ct. at 840–41. As the Senate Judiciary Committee has pointed out, prior to *Lafayette* and *Boulder*, "it was generally assumed that the 'State action' doctrine applied not only to States, but to local units of government as well." Report to the Senate Committee on the Judiciary on the Local Government Antitrust Act, S.Rep. No. 593, 98th Cong., 2d Sess. 1 (1984). Thus, when Congress discovered that this general assumption was mistaken, it decided to act and fill the void the Court created.

The Senate Judiciary Committee studied the effects of *Lafayette* and *Boulder* on the operation of local governments over a two year period. It found that "[m]ore than one hundred Federal antitrust suits seeking treble damages [were presently] pending against cities, counties, townships and virtually every other type of local government." Report of the Senate Committee on the Judiciary on the Local Government Antitrust Act, S.Rep. No. 593, 98th Cong., 2d Sess. 2 (1984). After considering the testimony of several antitrust scholars,[5] the Committee concluded that "in many instances, the practical impact of *Boulder* and *Lafayette* has been to paralyze the decisionmaking functions of local government. The threat of antitrust treble damage actions has caused local officials to avoid decisions that may touch on the antitrust laws even when such decisions have involved critical public services." *Id.* at 3. The Committee also concluded that "regardless of whether a local government has violated the antitrust laws, it is inappropriate to assess damages which ultimately must be borne by taxpayers."[6] *Id.* at 6–7.

The congressional debates over the Local Government Antitrust Act show that many Congressmen believed that there was an immediate need to take a "remedies approach" to saving local governments and their taxpayers from the potential financial ruin occasioned by large monetary awards under the Clayton Act. *See* H.R. 6027, 98th Cong., 2d Sess., 130 Cong.Rec. H8471 (daily ed. Aug. 6, 1984).[7] The Act does

---

**5.** The Honorable J. Paul McGrath, Assistant Attorney General of the Antitrust Division of the United States Department of Justice, Professors Phillip Areeda and Milton Handler testified before the Senate Judiciary Committee.

**6.** The Senate Judiciary Committee also recognized "the tremendous financial burden which can be placed on local governments in merely defending antitrust suits regardless of the outcome." Report of the Senate Committee on the Judiciary on the Local Government Antitrust Act, S.Rep. No. 593, 98th Cong., 2d Sess. 7 (1984).

**7.** Congressman Moorehead called H.R.6027 a "save government bill". H.R.6027, 98th Cong., 2d Sess., 130 Cong.Rec. H8471 (daily ed. Aug. 6,

1984). Impetus for the passage of the Local Government Antitrust Act was initiated by *Unity Ventures v. County of Lake and Village of Grayslake,* No. 81 C 2745 (N.D.Ill. Jan. 12, 1984). In *Unity Ventures,* a jury awarded the plaintiff $9.5 million in damages in an antitrust action against the local governments and their officials. The court trebled the award to $28.5 million. *See id.* at H8473 (statement of Congressman Hyde). Congressman Crane, who represents the district in which *Unity Ventures* is pending on appeal, stated during the House debates that this judgment, if upheld on appeal, could very well bankrupt Lake County. *See id.* at H8472–73.

appear to be a thoughtful response to the problem. Although some Congressmen[8] may have desired that Congress go further and grant local governments and their officials complete antitrust immunity, other Congressmen made clear that Congress was only taking a "remedies approach" and that persons injured by anticompetitive conduct of local governments retained the right to sue for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. section 26. As Congressman Edwards stated, the Act "offers a measured response to both the problems of local government and the needs of private parties." H.R. 6027, 98th Cong., 2d Sess., 130 Cong.Rec. H11695 (daily ed. Oct. 9, 1984.)[9]

The legislative history of the Act also demonstrates that Section 3(b) of the Act, which pronounces the criteria for retroactive application of the Act, was a compromise between those Congressmen who thought that retroactive application was not in accord with Congress' traditional approach to changing existing law[10] and those who felt that denial of retroactive application would unjustly penalize those localities that were defendants in pending suits for treble damages.[11] A primary concern was that retroactive application would divest a plaintiff of a favorable jury verdict or district court judgment.[12]

An early version of the House Bill, which passed overwhelmingly by a vote of 414 to 5 in August, 1984,[13] was silent on its application to pending cases. Representatives Crane and Hyde brought this matter to the House's attention; they both agreed that this silence was consistent with the general rule of law that pending cases are subject to the law in effect at the time they are actually and finally decided.[14] The Congressmen were referring to *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), in which the Supreme Court established "the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." 416 U.S. at 711, 94 S.Ct. at 2016. Thus, if the Bill that originally passed the House had been enacted without change, the *Bradley* rule would have mandated retroactive application of the Act unless the court found that manifest injustice would result. The Senate, however, passed a version of the Bill that specifically addresses the retroactive application of the Act with a provision almost identical to Section 3(b).[15]

On October 10, 1984, the Conference Committee met to resolve the differences

---

8. *See, e.g., id.* at H8474 Congressman Hyde stated that "[t]his legislation is an explicit statement that the antitrust laws were not intended to oversee or interfere with the decision making process at the local government level."

9. *See also* H.R.6027, 98th Cong., 2d Sess. 130 Cong.Rec. H11696 (daily ed. Oct. 9, 1984). Congressman Rodino explained that the Act does not immunize local governments from the antitrust laws, but precludes the use of damage suits, which many members of Congress believe to be an inappropriate remedy; *id.* at S14364 (daily ed. Oct. 11, 1984) Senator Thurmond remarked that the Act strikes an appropriate balance for "[w]hile taxpayers will not have to pay treble damage awards, injunctive relief will still be available to halt and prevent antitrust violations" of local governments.

10. *See* H.R.6027, 98th Cong., 2d Sess., 130 Cong. Rec. H8622–23 (daily ed. Aug. 8, 1984) (statement of Rep. Brooks).

11. *See id.* at H8475 (daily ed. Aug. 6, 1984) (statement of Rep. Fish); *id.* at H11696 (daily ed. Oct. 9, 1984) (statement of Rep. Sawyer); *id.* at H11697 (statement of Rep. Crane); *id.* at H12176 (daily ed. Oct. 11, 1984) Rep. Porter stated that "[o]ne inequity that is terribly compelling ... would be that which allows a recovery of money damages against just one, or a small group of defendant municipalities, while all others, before [*Boulder* and *Lafayette*] and after [the Local Government Antitrust Act], engaging in the same type of conduct have no such penalty."

12. *See, e.g., id.* at S13574 (daily ed. Oct. 4, 1984) (colloquy between Senator Eagleton and Rudman); *id.* at H12187 (daily ed. Oct. 11, 1984) (colloquy between Rep. Seiberling and Rep. Rodino).

13. *Id.* at H8622–24 (daily ed. Aug. 8, 1984).

14. *Id.* at H8473 (daily ed. Aug. 6, 1984).

15. *Id.* at S13574–75 (daily ed. Oct. 4, 1984).

between the House and Senate versions of the Bill. The Local Government Antitrust Act of 1984 was passed by the House and the Senate as H.R. 6027 on October 11, 1984. H.R. 6027, 98th Cong., 2d Sess. 130 Cong.Rec. H12175–89 (daily ed. Oct. 11, 1984); *id.* at S14364–69 (daily ed. Oct. 11, 1984). The retroactive application provision in the Senate's version of the Bill was accepted by the House with minor changes.

■ The Joint Explanatory Statement of the Conference Committee, which accompanied the Conference Report on the Bill, discusses the application of the Act to pending cases. The Statement provides:

The application to pending cases of the money damage protection afforded by section 3 will be based upon a case-by-case determination by the district court. The local government has the burden of proof to establish to the court's satisfaction that it would be inequitable not to apply this act to the pending case. The court is to consider all relevant circumstances. The statute mentions two of the factors that the court should consider—stage of litigation and the availability of alternative relief under the Clayton Act. Where a pending case is in an early stage of litigation and where injunctive relief can remedy the problem, the defendant local government may be able more easily to sustain its burden. Where a case is in more advanced stages of litigation or where injunctive relief is

unavailable or incomplete, the burden would become more difficult. If a case has progressed to or beyond a jury verdict or district court judgment, a local government defendant would need compelling equities on its side to justify the application of this section to the pending case.

Conference Report on H.R. 6027, 98th Cong., 2d Sess., 130 Cong.Rec. H11850–51 (daily ed. Oct. 10, 1984). This Statement makes clear that as either of the two factors specifically mentioned in Section 3(b) of the Act (stage of litigation and availability of alternative relief under the Clayton Act) moves towards weighing against retroactive application, the defendant's burden to establish that denial of such application would be inequitable becomes more difficult. On the other hand, unless a verdict or judgment has been rendered, there is no presumption against retroactive application of the prohibition contained in Section 3(a) of the Act to a pending case.

*Defendants' Burden: Stage of Litigation and Availability of Injunctive Relief*

A. Defendants' Burden

When the Local Government Antitrust Act was enacted on October 24, 1984, this case was in the pre-trial discovery stage of litigation.[16] It still is.[17] The record reflects that prior to October 1984 most of the discovery that took place was by way of interrogatories and requests for production of documents. It was not until No-

---

**16.** The Act is silent about the date from which courts should determine the stage of litigation. Defendants waited approximately six weeks from the enactment of the Act to bring to the Court's attention their intention to move to dismiss the Plaintiff's claim for monetary damages under the Clayton Act on the ground that the Local Government Act prohibited this claim. *See* District Court's Minute Entry of Dec. 5, 1984 (document No. 57 in District Court Record). The Plaintiff, however, was or should have been on notice of the potential consequences of the Act on this case by the time of the Act's date of enactment, October 24, 1984. Indeed, as early as November 27, 1984, JDC admitted that the Act "place[d] a cloud over the certainty of JDC's recovering damages under the Clayton Act in the event JDC prevails in its substantive antitrust claims." Plaintiff's Memorandum in Opposition to Defendants' Motion for Leave to File

Supplemental and Amended Answer p. 3 (document No. 54 in District Court Record). Thus, this Court does not believe that it is unfair to use October 24, 1984 as the date from which to determine the stage of litigation. Furthermore, the Plaintiff is not prejudiced by the use of this date because the case has progressed very little since then.

**17.** A colloquy between Congressmen Seiberling and Rodino, who were members of the Conference Committee that submitted the final version of the Act to Congress, indicates that Congress believed that a case in which pre-trial discovery is not yet complete should be considered to be in an early stage of litigation. *See* H.R. 6027, 98th Cong., 2d Sess., 130 Cong.Rec. H12187 (daily ed. Oct. 11, 1984).

vember and December 1984 that the parties took most of the depositions of fact witnesses.[18] Furthermore, there have been no rulings by this Court on the substantive issues presented by this case. This motion is the first nondiscovery-related motion which has been presented to the Court. Moreover, at least for the Defendants, if not for the Plaintiff, much more trial preparation remains to be done in this case.

This Court does not ignore JDC's assertion that prior to October 1984 its attorneys and in-house management personnel spent substantial time reviewing the numerous documents involved in this suit and working with its primary expert witness. Nor is this Court unaware that JDC has already incurred a considerable amount of legal fees and other litigation-related expenses. Indeed, those factors weigh against retroactive application of the Act. But they only make the Defendants' burden here more difficult; they do not preclude the Defendants from satisfying it.

■ The Defendants' burden is also made more difficult by the fact that injunctive relief could be an incomplete remedy in this case.[19] JDC is seeking monetary compensation for economic harm to its business allegedly suffered since 1982 when American Waste was awarded and began to perform its contract to serve Garbage Districts Two and Six of Jefferson Parish.[20] JDC contends that if the Parish's bidding process had not intentionally discriminated

against it—that is, had not violated the antitrust laws—that it would have been the lowest bidder and, thus, awarded the contract instead of American Waste. Retroactive application of the Act would preclude recovery for the past damages. The Court also recognizes that JDC should not be unjustly penalized for failing to seek injunctive relief prior to the award of the contract to American Waste. JDC should not be asked to predict that in 1984, Congress would pass a law jeopardizing its damage claim under the Clayton Act. On the other hand, it is undisputed that injunctive relief was available to JDC at the time of the alleged anticompetitive acts of the Defendants and, while injunctive relief might not be a complete remedy now, it is still available to JDC. Further, and most important, the very purpose of the Act is to insulate local governments from the kind of economic damages Plaintiff claims to have suffered.

■ This Court finds that the Defendants' burden here to establish that denial of the application of the Act to this pending case would be inequitable is a fairly difficult one. Defendants have met their burden.

**B. The Availability of Injunctive Relief Would Make It Inequitable to Deny Application of the Act**

There is significant doubt that this Court, under its equity powers, could set

---

**18.** JDC complains that it was forced to take these depositions in November and December 1984 to comply with the Court's preliminary pre-trial order requiring factual discovery to be completed by December 10, 1984. The Plaintiff is correct that the Court's minute entry of July 10, 1984 set a discovery deadline of December 10, 1984. (document No. 14 in District Court Record). The Court, however, when it learned of Defendants' intention to file this motion, extended the deadline to March 1, 1985. *See* District Court's Minute Entry of Dec. 5, 1984 (document No. 57 in District Court Record). This extension was granted on December 5, 1984 at a status conference at which counsel for JDC was present.

**19.** Section 3(b) of the Act states that the Court should look at the availability of alternative relief under the Clayton Act. The only other remedy available is injunctive relief provided by

Section 16 of the Clayton Act, 15 U.S.C. section 26. Also, it should be noted that although the Act prohibits awarding costs and attorney's fees under Section 4 of the Clayton Act, a plaintiff who prevails in obtaining an injunction under Section 16 is still entitled to an award of costs and attorney's fees.

**20.** In its unamended complaint, which was initially filed in this case, JDC requested injunctive relief. *See* Plaintiff's Complaint (document No. 1 in District Court Record). For some reason not known to this Court, JDC, in its amended complaint, dropped this request. *See* Plaintiff's Amended Complaint (document No. 82 in District Court record). Regardless of whether or not the Plaintiff seeks injunctive relief, this Court is not precluded from determining if such an alternative remedy is available under the Clayton Act.

aside the contract entered into between Jefferson Parish and American Waste in 1982 for the collection and disposal of municipal solid waste. *See H.K. Porter Company v. Metropolitan Dade County*, 650 F.2d 778 (5th Cir.1981); *Save the Bay, Inc. v. The United States Army*, 639 F.2d 1100 (5th Cir.1981). Injunctive relief, however, is available prospectively. The Supreme Court in *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), instructed that a district court is empowered to fashion appropriate restraints on a defendant's future activities "both to avoid a recurrence of the violation and to eliminate its consequences." 435 U.S. at 697, 98 S.Ct. at 1368 (citations omitted).[21] Thus, so long as the injunctive relief is "a reasonable method of eliminating the consequences of the illegal conduct," it may be rendered. *Id.* In the instant case, the availability of prospective injunctive relief is of major importance; although it does not satisfy JDC's more pecuniary concerns, it provides JDC with the opportunity to challenge the legality of Jefferson Parish's bidding process and, if successful in proving a violation of the antitrust laws, to have the Court correct the process for the future.

JDC claims that injunctive relief is now foreclosed to it because, subsequent to the allegedly anticompetitive conduct complained of in this case, the State of Louisiana enacted a statute prospectively authorizing local governments to grant exclusive garbage disposal rights.[22] The statute provides local governments in Louisiana with state authorization to create a public service monopoly in the garbage disposal and collection market in their jurisdictions, when necessary and appropriate. Under the statute, a parish may create such a public monopoly by granting an exclusive franchise to a private company or companies or by itself engaging in the collection and disposal of garbage to the exclusion of private companies.

The argument that the new Louisiana statute forecloses prospective injunctive relief here is only speculative. As was made clear by the First Circuit in *Corey v. Look*, 641 F.2d 32 (1981), there is an important difference between competitive means and ends. The *Corey* court explained that the statutory power to monopolize a market does not exempt all means to achieve the monopoly from antitrust scrutiny. 641 F.2d at 37.[23] In the instant case, the Court

**21.** *See also United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 250, 88 S.Ct. 1496, 1500, 20 L.Ed.2d 562 (1968) (explaining that a court may enter a decree to restore workable competition to the market place and ensure that there are no practices likely to result in future antitrust violations); *International Telephone and Telegraph Corp. v. General Telephone & Electronics Corp.*, 518 F.2d 913, 925 (9th Cir.1975) stating that "[i]njunctive remedies under section 16 [of the Clayton Act] may be as broad as necessary to ensure that 'threatened loss or damage' does not materialize or that prior violations do not recur."

**22.** In August 1982, Louisiana enacted a statute, La.Rev.Stat.Ann. 33:4169.1 (West Supp.1985), which provides in relevant part:
A. The governing authority of every parish or municipality shall have the following powers:
(1) To engage in the collection and disposal of garbage and trash within its jurisdiction in cooperation with, or to the exclusion of, other garbage and trash collectors.
(2) To grant permits, licenses, exclusive or non-exclusive franchises, or any combination

thereof to garbage and trash collectors and disposers. Any exclusive franchise shall be granted only after advertising for bids, reception of bids, and awarding of the contract or contracts in accordance with the public bid laws of the state and other provisions of law.
(3) To enter into time contracts for the collection and transportation of garbage or trash for a term of up to ten years, and for disposal of garbage or trash for a term of up to twenty-five years.
. . . .
D. The governing authority of any municipality or parish is authorized to carry out the provisions of this Section as acts of government on behalf of the state of Louisiana as sovereign, and, to the extent the governing authorities deem necessary or appropriate, are further authorized to displace competition and provide a monopoly public service.

**23.** In *Corey*, the plaintiff sued the town and the Steam Boat Authority, alleging that they conspired to deprive the plaintiff, who was in the business of operating parking lots, of an award to run a particular lot. The contract was

could arguably correct the alleged anticompetitive nature of the Parish's bidding process without interfering with the Parish's statutory privilege to create a monopoly public service. Indeed, the Louisiana statute states that the Parish can grant exclusive franchises only after complying with the State's public bid laws and *"other provisions of law."* [24] Thus, not all means are necessarily exempted to achieve a public monopoly goal.

Since prospective injunctive relief is still available to cure future violations of the Federal antitrust laws, it would be inequitable to the taxpayers of Jefferson Parish for this Court to deny the Parish immunity from treble damages. This Court does not need to inquire whether there are sufficient funds in Jefferson Parish's budget to pay a treble damage award in the millions of dollars. It cannot be denied that a judgment of that magnitude would have an adverse impact on any community in this country and would be totally at odds with the spirit and intent of the Act. Thus, even if it is true, as JDC claims, that the Defendants' alleged anticompetitive behavior resulted in the Parish's citizens paying more for garbage collection and disposal, it would be in the best interest of the community to tailor some prospective injunctive relief rather than threaten the public fisc. This approach is mandated by the national concern behind the Local Government Antitrust Act of 1984.

*Constitutionality of the Retroactive Application of the Act*

 Any discussion of the constitutionality of the retroactive application of a statute must begin with the first principle "that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974).[25] The *Bradley* Court found justification for this principle in the words of Chief Justice Marshall in *United States v. Schooner Peggy*, 1 Cranch 103, 2 L.Ed. 49 (1801). There, the Chief Justice observed:

> It is true that in *mere private cases* between individuals, a court will and ought to struggle hard against a construction which will, by retroactive operation, affect the rights of parties, *but in great national concerns* ... the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of the law, the judgment must be set aside.

416 U.S. at 712, 94 S.Ct. at 2016 (emphasis added).

The *Bradley* Court also discussed its concern that injustice could result from the retroactive application of a change in the law. It acknowledged that the Court, on several occasions, had refused to apply a change retroactively because it concluded that doing so "would infringe upon or deprive a person of a right that had matured or become unconditional." 416 U.S. at 720,

---

awarded to the Authority, plaintiff's competitor. State statutes authorized the Authority to operate parking lots and the town to regulate parking, but neither statute authorized the displacement of competition. The court stated that

> Even had the authority been granted the statutory power to monopolize the parking market, this would not necessary exempt all means to achieve this end. For instance, simply because one can enforce zoning laws does not necessarily mean that one can burn down a neighbor's offending building. Thus the Authority cannot establish that there is a "clearly articulated and affirmatively ex-

pressed" sovereign state policy favoring the Authority's boycott of competitors in the parking market.

641 F.2d at 37.

**24.** La.Rev.Stat.Ann. 33:4169.1(A)(2) (West Supp. 1985) (emphasis added).

**25.** This Court has already determined that criteria of Section 3(b) of the Local Government Antitrust Act direct that the Act be applied to this pending case. The statutory directive is not to the contrary. *See* text accompanying notes 16–24.

94 S.Ct. at 2020.[26] Of course, a legislature may not divest an individual of a vested property right protected by the due process clause of the Federal Constitution. But not all retroactive legislation is constitutionally infirm.

■ The Supreme Court has observed that "[t]he mere fact that a statute applies to a civil action retrospectively does not render it unconstitutional." *Cohen v. Beneficial Industrial Loan Corporation,* 337 U.S. 541, 554, 69 S.Ct. 1221, 1229, 93 L.Ed. 1528 (1949). When, however, a legislative change alters the substantive rights of the parties the constitutional validity of applying the change to a pending case does become suspect. *Id.* On the other hand, when a statute changes only remedies or procedures, and does not affect substantive rights, there is no constitutional barrier to applying it to a pending case. *Friel v. Cessna Aircraft Company,* 751 F.2d 1037 (9th Cir.1985); *see also Bradley,* 416 U.S. at 721, 94 S.Ct. at 2021; *Ettor v. City of Tacoma,* 228 U.S. 148, 155, 33 S.Ct. 428, 430, 57 L.Ed. 773 (1913); *Keller v. Dravo Corporation,* 441 F.2d 1239, 1242 (5th Cir. 1971), *cert. denied,* 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972). As the Ninth Circuit stated in *Friel,* the reason for this difference is that

> Non-retrospective application of a statute "prevents the assigning of a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed." *Union Pacific R.R. Co. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913). This danger is not present where statutes merely affect remedies or procedures.

*Friel,* at 1039. Thus, where "there [is] no change in the substantive obligation of the parties," [27] or "the changing or repealing statute leaves the parties a substantial remedy," [28] or "one remedy is substituted for another," [29] there is no Fifth Amendment encroachment.

In order to determine whether retroactive application of the Local Government Antitrust Act to the instant case violates JDC's Fifth Amendment due process rights, this Court, following the lead of the cases cited above, must take three factors into consideration. First, whether the national concern behind the Act compels retroactive application. Second, whether retroactive application of the Act changes the parties' substantive rights or only alters the remedy. Third, if retroactive application affects the parties substantive rights, whether JDC has a vested, constitutionally protected interest in a claim for treble damages under the Clayton Act.

■ As discussed earlier in this opinion, the Act deals with a matter of great national concern, as anticipated in *Bradley.* "Indeed, the circumstances surrounding the passage of [the Act], and the numerous expressions of congressional concern and intent with respect to the enactment of [the Act], all proclaim its status as having to do with a 'great national concern.' " *Bradley,* 416 U.S. at 719, 94 S.Ct. at 2020. Furthermore, Congress entrusted Federal district courts with the task of giving effect to its intent to "protect [local governments] from these treble damage lawsuits that are devastating to the very people that the antitrust laws were designed to protect." H.R. 6027, 98th Cong., 2d Sess., 130 Cong.Rec. H12184 (daily ed. Oct. 11, 1984) (statement of Representative Sawyer). This Court

**26.** The Court cited *Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964); *Claridge Apartments Co. v. Commissioner of Internal Revenue,* 323 U.S. 141, 65 S.Ct. 172, 185, 89 L.Ed. 139 (1944); *Union Pacific R. Co. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913). Both *Greene* and *Claridge* stand for the proposition that antecedent rights to a damage award cannot be subsequently revoked unless there is clear legislative intent to the contrary.

**27.** *Bradley,* 416 U.S. at 721, 94 S.Ct. at 2021.

**28.** *Ettor,* 228 U.S. at 155, 33 S.Ct. at 430. *Cf. Duke Power Co. v. South Carolina Tax Commission,* 81 F.2d 513, 517 (4th Cir.1936), *cert. denied,* 298 U.S. 669, 56 S.Ct. 834, 80 L.Ed. 1392 (1936).

**29.** *Keller,* 441 F.2d at 1242.

also recognizes that Congress has great power, under the Commerce Clause, to regulate as it perceives what is in the best interest of the public and that sometimes, unfortunately, such regulation may frustrate well-founded hopes and expectations that are nevertheless not in any legal sense vested property rights under the Constitution.[30] This Court, then, is hesitant to find a constitutional violation when one does not clearly exist.

▪ Retroactive application of Section 3(a) of the Local Government Antitrust Act does not, in any manner, alter the substantive rights of the parties to the pending proceeding. JDC's existing cause of action under the Sherman Act is not abated. The conduct of local governments and their officials remains subject to scrutiny under the Federal antitrust laws. The Act does not assign an effect to the acts of Jefferson Parish and Patrick Kiloski that is different from the effect when those acts were performed three years ago. The Act merely takes a remedial approach to the problem by precluding an award of damages under the Clayton Act. It leaves JDC with a remedy in the form of prospective injunctive relief. Thus, the hint of a possible constitutional violation is not even present.

▪ Even if the retroactive application of the Act in some way affected the substantive rights of the parties, there would still be no constitutional violation here. This Court holds that a plaintiff does not have a vested property right under the due process clause of the Fifth Amendment in a mere claim for damages. Many courts have held that Congress may abate existing causes of action without violating the due process clause so long as there is no final nonreviewable judgment. *Daylo v. Administrator of Veterans Affairs*, 501 F.2d 811, 818 (D.C.Cir.1974); *Fisch v. General Motors Corporation*, 169 F.2d 266, 270 (6th Cir.1948); *Seese v. Bethlehem Steel Company*, 168 F.2d 58 (4th Cir.1948); *United States ex rel. Rodriguez v. Weekly Publications, Inc.*, 144 F.2d 186 (2d Cir. 1944); *Hospital Association of New York State, Inc. v. Toia*, 435 F.Supp. 819, 829 (S.D.N.Y.1977); *Jones v. American Window Cleaning Corporation*, 210 F.Supp. 921, 923 (E.D.Va.1962).[31] This interpreta-

---

**30.** *See Fisch v. General Motors Corp.,* 169 F.2d 266, 270–72 (6th Cir.1948), *cert. denied,* 335 U.S. 902, 69 S.Ct. 405, 93 L.Ed. 436 (1949); *Seese v. Bethlehem Steel Co.,* 168 F.2d 58, 62–64 (4th Cir.1948).

**31.** This Court recognizes that there is case law supporting JDC's contention that one has a vested property right in a cause of action once it has somehow accrued. *See Hartford Fire Insurance Co. v. Lawrence, Dykes, Goodenberger, Bower & Clancy,* 740 F.2d 1362, 1367 (6th Cir.1984); *Ducre v. Mine Safety Appliances,* 573 F.Supp. 388, 392 (E.D.La.1983), *rev'd in part on other grounds Ducre v. Executive Officers of Halter Marine, Inc.,* 752 F.2d 976 (5th Cir.1985) (the constitutional issue was not discussed); *Edwardsen v. Morton,* 369 F.Supp. 1359 (D.D.C. 1973); *Jacklitch v. Redstone Federal Credit Union,* 463 F.Supp. 1134, 1139 n. 2 (N.D.Ala.1979). Those cases are conceptually difficult to reconcile with cases that hold that a plaintiff does not have a vested property right in a claim unless there is a final nonreviewable judgment. This Court disagrees with the former group of cases. They deal too loosely with the notion of what is property or a right. Additionally, the Court does not agree with the Plaintiff that *Ducharme v. Merrill-National Laboratories,* 574 F.2d 1307 (5th Cir.), *cert. denied,* 439 U.S. 1002, 99 S.Ct. 612, 58 L.Ed.2d 677 (1978), stands for the proposition that an existing cause of action is a vested property right protected by the Constitution. The holding in *Ducharme* was that "a plaintiff has no vested right in any tort claim for damages under state law." 574 F.2d at 1309. In dicta, the court noted that the plaintiffs' action against the manufacturer under Louisiana law, which was abrogated by the Federal Swine Flu Act, did not even accrue until the passage of the Act. Thus, according to the court, the "[p]laintiff had no prior vested right in a cause of action" under Louisiana law. *Id.* at 1310. The court, however, ended its discussion there without discussing whether a so-called vested right in a cause of action would mandate constitutional protection under the due process clause of the Fifth Amendment.

Furthermore, retroactive application of Section 3(a) of the Act to the pending case does not impair a previously vested contractual right. A possible violation of the Contract Clause of the Federal Constitution is not at issue here. Therefore, *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); *Coombes v. Getz,* 285 U.S. 434, 52 S.Ct. 435, 76 L.Ed. 866 (1932); and *Richmond Screw Anchor Co. v. U.S.,* 275 U.S. 331, 48 S.Ct. 194, 72 L.Ed. 303 (1928), are not relevant here.

tion of the due process clause is in accord with the general rule that " 'an appellate court must apply the law in effect at the time it renders its decision.' " *Bradley*, 416 U.S. at 714, 94 S.Ct. at 2017. Also, it is constitutionally and conceptually sound to make a distinction between inchoate rights, rights that are contingent or expectant, and rights to the present, unalterable, enjoyment of property. *See Fisch*, 169 F.2d at 270. Only the latter type of right requires constitutional protection. Thus, only final nonreviewable judgments should be accorded the dignity of vested constitutionally guarded rights. Since JDC's claim for treble damages under the Clayton Act has not ripened to a final nonreviewable judgment, and might never do so, it is not a vested, constitutionally protected, right.

### Tucker Act Remedy

The Defendants contend that, even if JDC had a vested property right in its damage claim, retroactive application of the Act would not violate the Fifth Amendment because JDC can seek compensation from the Federal government in the Court of Claims pursuant to the Tucker Act, 28 U.S.C. section 1491. This issue does not need to be resolved here because retroactive application of the Act neither alters JDC's substantive rights under the Federal Antitrust laws nor divests JDC of a vested right. To the extent, however, that JDC's loss of its monetary remedy could be considered a taking under the Fifth Amendment and that the Tucker Act may provide compensation, a brief discussion of the issue might be useful.

The Tucker Act provides that "(t)he Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded ... upon the Constitution...." 28 U.S.C. section 1491. Although the Tucker Act itself does not create any substantive rights for compensation from the United States, a substantive right to such compensation could be grounded in the Constitution. *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 2967, 77 L.Ed.2d 580 (1983). In *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), the Supreme Court held that "[a] claim founded upon a taking of property for public use by operation of [a Federal statute] without just compensation in violation of the Fifth Amendment plainly would fall within the literal words of 'any claim against the United States founded ... upon the Constitution....' " 419 U.S. at 125, 95 S.Ct. at 350.[32] The Supreme Court, in *Regional Rail*, further instructed that Tucker Act compensation is available as long as the Federal statute causing the taking and the legislative history of the statute do not evince congressional intent to withdraw the Tucker Act remedy. If the Tucker Act remedy is available, there is no violation of the Just Compensation Clause of the Fifth Amendment because there is simply no uncompensated taking.[33]

Neither the Local Government Antitrust Act itself nor the legislative history of the Act evinces a congressional intent to withdraw a claim against the United States for a taking of a vested property right by the Act.[34] Therefore, it appears that any unlawful taking caused by the retroactive application of the Act would not go uncompensated and, thus, such a taking would not violate the Just Compensation Clause. This Court holds, however, that retroactive

**32.** *See also Dames & Moore v. Regan*, 453 U.S. 654, 688–89, 101 S.Ct. 2972, 2991, 69 L.Ed.2d 918 (1981) (holding that a party has an action in the Court of Claims for an unconstitutional taking by the Federal government).

**33.** *See Duke Power Co. v. Carolina Environ. Study*, 438 U.S. 59, 94 N. 39, 98 S.Ct. 2620, 2641 N. 39, 57 L.Ed.2d 595 (1978).

**34.** The only mention of the Tucker Act in the legislative history is in a memorandum read into the record by Senator Symms. *See* H.R. 6027, 98th Cong., 2d Sess., 130 Cong.Rec. S14366 (daily ed. Oct. 11, 1984). This memorandum merely discusses the possibility of a Tucker Act remedy if retroactive application of the Act was held to be a taking of property without just compensation. It does not state whether or not Congress intended to withdraw the remedy.

application of the Act does not result in any constitutional infirmity.

## CONCLUSION

For the foregoing reasons, this Court holds that Section 3(a) of the Local Government Antitrust Act of 1984 applies to this pending case. Accordingly, the Defendants' motion to dismiss the Plaintiff's claim for monetary damages, interest, costs and attorney's fees under Section 4 of the Clayton Act on the ground that such a claim is prohibited by the Local Government Antitrust Act is GRANTED.