March 17, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1270

U. S. HEALTHCARE, INC., ETC., ET AL.,

Plaintiffs, Appellants,

v.

HEALTHSOURCE, INC., ET AL.,

Defendants, Appellees

ERRATA SHEET

The opinion of this court issued on February 26, 1993 is
amended as follows:

In footnote 1, l. 2, replace "1992" with "1991".

On page 7, l. 9, replace "mid-1992" with "mid-1991".

March 12, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1270

U. S. HEALTHCARE, INC., ETC., ET AL.,

Plaintiffs, Appellants,

v.

HEALTHSOURCE, INC., ET AL.,

Defendants, Appellees

ERRATA SHEET

The opinion of this court issued on February 26, 1993 is
amended as follows:

On page 7, three lines above section II, replace "1992" with
"1991".

February 26, 1993
UNITED STATES COURT OF APPEALS
For The First Circuit

No. 92-1270

U. S. HEALTHCARE, INC., ETC., et al.,

Plaintiffs, Appellants,

v.

HEALTHSOURCE, INC., ETC., et al.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[William H. Barry, Jr., Magistrate Judge]

Before

Torruella, Cyr and Boudin, Circuit Judges.

Franklin Poul with whom Dana B. Klinges, Mark L. Heimlich, Wolf,

Block, Schorr and Solis-Cohen, Andrew D. Dunn, Thomas Quarles, Jr. and

Devine, Millimet & Branch were on brief for appellants.

Thomas Campbell with whom Deborah H. Bornstein, James W. Teevans,

Gardner, Carton & Douglas, William J. Donovan, Peter S. Cowan and

Sheehan, Phinney, Bass & Green were on brief for appellees.

February 26, 1993

BOUDIN, Circuit Judge. U.S. Healthcare and two related

companies (collectively "U.S. Healthcare") brought this

antitrust case in the district court against Healthsource,

Inc., its founder and one of its subsidiaries. Both sides

are engaged in providing medical services through health

maintenance organizations ("HMOs") in New Hampshire. In its

suit U.S. Healthcare challenged an exclusive dealing clause

in the contracts between the Healthsource HMO and doctors who

provide primary care for it in New Hampshire. After a trial

in district court, the magistrate judge found no violation,

and U.S. Healthcare appealed. We affirm.

I. BACKGROUND

Healthsource New Hampshire is an HMO founded in 1985 by

Dr. Norman Payson and a group of doctors in Concord, N.H.

Its parent company, Healthsource, Inc., is headed by Dr.

Payson and it manages or has interests in HMOs in a number of

states. We refer to both the parent company and its New

Hampshire HMO as "Healthsource."

In simpler days, health care comprised a doctor, a

patient and sometimes a hospital, but the Norman Rockwell era

of medicine has given way to a new world of diverse and

complex insurance and provider arrangements. One of the more

successful innovations is the HMO, which acts both as a

health insurer and provider, charging employers a fixed

premium for each employee who subscribes. To provide medical

-2-

care to subscribers, an HMO of Healthsource's type--sometimes

called an individual practice association or "IPA" model HMO-

-contracts with independent doctors. These doctors continue

to treat other patients, in contrast to a "staff" model HMO

whose doctors would normally be full-time employees of the

HMO.

HMOs often can provide health care at lower cost by

stressing preventative care, controlling costs, and driving

hard bargains with doctors or hospitals (who thereby obtain

more patients in exchange for a reduced charge).

Healthsource, like other HMOs, uses primary care physicians--

usually internists but sometimes pediatricians or others--as

"gatekeepers" who direct the patients to specialists only

when necessary and who monitor hospital stays. Typically,

the contracting primary care physicians do not charge by the

visit but are paid "capitations" by the HMO, a fixed amount

per month for each patient who selects the doctor as the

patient's primary care physician. Unlike a patient with

ordinary health insurance, the HMO patient is limited to the

panel of doctors who have contracted with the HMO.

There are familiar alternatives to HMOs. At the

"financing" end, these include traditional insurance company

policies that reimburse patients for doctor or hospital bills

without limiting the patient's choice of doctor, as well as

Blue Cross/Blue Shield plans of various types and Medicare

-3-

and Medicaid programs. At the "provider" end, there is also

diversity. Doctors may now form so-called preferred provider

organizations, which may include peer review and other joint

activities, and contract together to provide medical services

to large buyers like Blue Cross or to "network" model HMOs.

There are also ordinary group medical practices. And, of

course, there are still doctors engaged solely in independent

practice on a fee-for-service basis.

Healthsource's HMO operations in New Hampshire were a

success. At the time of suit, Healthsource was the only non-

staff HMO in the state with 47,000 patients (some in nearby

areas of Massachusetts), representing about 5 percent of New

Hampshire's population. Stringent controls gave it low

costs, including a low hospital utilization rate; and it

sought and obtained favorable rates from hospitals and

specialists. Giving doctors a further stake in

Healthsource's success and incentive to contain costs, Dr.

Payson apparently encouraged doctors to become stockholders

as well, and at least 400 did so. By 1989 Dr. Payson was

proposing to make Healthsource a publicly traded company, in

part to permit greater liquidity for its doctor shareholders.

U.S. Healthcare is also in the business of operating

HMOs. U.S. Healthcare, Inc., the parent of the other two

plaintiff companies--U.S. Healthcare, Inc. (Massachusetts)

and U.S. Healthcare of New Hampshire, Inc.--may be the

-4-

largest publicly held provider of HMO services in the

country, serving over one million patients and having total

1990 revenues of well over a billion dollars. Prior to 1990,

its Massachusetts subsidiary had done some recruiting of New

Hampshire doctors to act as primary care providers for

border-area residents served by its Massachusetts HMO. In

1989, U.S. Healthcare had a substantial interest in expanding

into New Hampshire.

Dr. Payson was aware in the fall of 1989 that HMOs

operating in other states were thinking about offering their

services in New Hampshire. He was also concerned that, when

Healthsource went public, many of its doctor-shareholders

would sell their stock, decreasing their interest in

Healthsource and their incentive to control its costs. After

considering alternative incentives, Dr. Payson and the HMO's

chief operating officer conceived the exclusivity clause that

has prompted this litigation. Shortly after the Healthsource

public offering in November 1989, Healthsource notified its

panel doctors that they would receive greater compensation if

they agreed not to serve any other HMO.

The new contract term, effective January 26, 1990,

provided for an increase in the standard monthly capitation

paid to each primary care physician, for each Healthsource

HMO patient cared for by that doctor, if the doctor agreed to

-5-

the following optional paragraph in the basic doctor-

Healthsource agreement:

11.01 Exclusive Services of Physicians. Physician

agrees during the term of this Agreement not to
serve as a participating physician for any other
HMO plan; this shall not, however, preclude
Physician from providing professional courtesy
coverage arrangements for brief periods of time or
emergency services to members of other HMO plans.

A doctor who adopted the option remained free to serve non-

HMO patients under ordinary indemnity insurance policies,

under Blue Cross\Blue Shield plans, or under preferred

provider arrangements. A doctor who accepted the option

could also return to non-exclusive status by giving notice.1

Although Healthsource capitation amounts varied, a

doctor who accepted the exclusivity option generally

increased his or her capitation payments by a little more

than $1 per patient per month; the magistrate judge put the

amount at $1.16 and said that it represented an average

increase of about 14 percent as compared with non-exclusive

status. The dollar benefit of exclusivity for an individual

doctor obviously varies with the number of HMO patients

handled by the doctor. Many of the doctors had less than 100

Healthsource patients while about 50 of them had 200 or more.

1The original notice period was 180 days. This was
reduced to 30 days in March or April 1991. It appears, at
least in practice, that a doctor could switch to non-
exclusive status more rapidly by returning some of the extra
compensation previously paid.

-6-

About 250 doctors, or 87 percent of Healthsource's primary

care physicians, opted for exclusivity.

U.S. Healthcare through its New Hampshire subsidiary

applied for a New Hampshire state license in the spring of

1990, following an earlier application by its Massachusetts

subsidiary. A cease and desist order was entered against it,

limiting its marketing efforts, because of premature claims

that it had approval to operate in the state. The cease and

desist order was withdrawn on February 15, 1991, and the

license issued on February 21, 1991, subject to later

approval of marketing materials. The present suit was filed

in district court by U.S. Healthcare against Healthsource and

Dr. Payson on March 12, 1991. By mid-1991, U.S. Healthcare

had only two New Hampshire "accounts" and only about 18

primary care physicians.

In the district court, U.S. Healthcare challenged the

exclusivity clause under sections 1 and 2 of the Sherman Act,

15 U.S.C. 1-2, and under state antitrust and tort law.

The parties stipulated to trial before a magistrate judge.

After discovery, two separate weeks of trial were conducted

in August and September 1991. In a decision filed on January

30, 1992, the magistrate judge found for the defendants on

all counts. This appeal followed.

II. DISCUSSION

-7-

In this court, U.S. Healthcare attacks the exclusivity

clause primarily as a per se or near per se violation of

section 1; accordingly we begin by examining the case through

the per se or "quick look" lenses urged by U.S. Healthcare.

We then consider the claim recast in the more conventional

framework of Tampa Electric Co. v. Nashville Coal Co., 365

U.S. 320 (1961), the Supreme Court's latest word on

exclusivity contracts, appraising them under section 1's rule

of reason. Finally, we address U.S. Healthcare's claims of

section 2 violation and its attacks on the market-definition

findings of the magistrate judge.

The Per Se and "Quick Look" Claims. U.S. Healthcare's

challenge to the exclusivity clause, calling it first a per

se violation and later a monopolization offense, invokes a

signal aspect of antitrust analysis: the same competitive

practice may be reviewed under several different rubrics and

a plaintiff may prevail by establishing a claim under any one

of them. Thus, while an exclusivity arrangement is often

considered under section 1's rule of reason, it might in

theory play a role in a per se violation of section 1, cf.

Eastern States Retail Lumber Dealers' Ass'n v. United States,

234 U.S. 600 (1914), or as an element in attempted or actual

monopolization, United States v. United Shoe Machinery Corp.,

110 F. Supp. 295 (D. Mass. 1953), aff'd per curiam, 347 U.S.

-8-

521 (1954). But each rubric has its own conditions and

requirements of proof.

We begin, as U.S. Healthcare does, with the per se rules

of section 1 of the Sherman Act. It is a familiar story that

Congress left the development of the Sherman Act largely to

the courts and they in turn responded by classifying certain

practices as per se violations under section 1. Today, the

only serious candidates for this label are price (or output)

fixing agreements and certain group boycotts or concerted

refusals to deal.2 The advantage to a plaintiff is that

given a per se violation, proof of the defendant's power, of

illicit purpose and of anticompetitive effect are all said to

be irrelevant, see United States v. Socony-Vacuum Oil Co.,

310 U.S. 150 (1940); the disadvantage is the difficulty of

squeezing a practice into the ever narrowing per se nitch.

U.S. Healthcare's main argument for per se treatment is

to describe the exclusivity clause as a group boycott. To

understand why the claim ultimately fails one must begin by

recognizing that per se condemnation is not visited on every

arrangement that might, as a matter of language, be called a

group boycott or concerted refusal to deal. Rather, today

that designation is principally reserved for cases in which

2Tying is sometimes also described as a per se offense
but, since some element of power must be shown and defenses
are effectively available, "quasi" per se might be a better
label. See Eastman Kodak Co. v. Image Technical Services,

Inc., 112 S. Ct. 2072 (1992).

-9-

competitors agree with each other not to deal with a supplier

or distributor if it continues to serve a competitor whom

they seek to injure. This is the "secondary boycott" device

used in such classic boycott cases as Eastern States Retail

Lumber Dealers' Ass'n, and Fashion Originators' Guild of

America, Inc. v. FTC, 312 U.S. 457 (1941).

We doubt that the modern Supreme Court would use the

boycott label to describe, or the rubric to condemn, a joint

venture among competitors in which participation was allowed

to some but not all, compare Northwest Wholesale Stationers,

Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284

(1985), with Associated Press v. United States, 326 U.S. 1

(1945), although such a restriction might well fall after a

more complete analysis under the rule of reason. What is

even more clear is that a purely vertical arrangement, by

which (for example) a supplier or dealer makes an agreement

exclusively to supply or serve a manufacturer, is not a group

boycott. See Klor's, Inc. v. Broadway-Hale Stores, 359 U.S.

207, 212 (1959); Corey v. Look, 641 F.2d 32, 35 (1st Cir.

1981). Were the law otherwise, every distributor or retailer

who agreed with a manufacturer to handle only one brand of

television or bicycle would be engaged in a group boycott of

other manufacturers.

There are multiple reasons why the law permits (or, more

accurately, does not condemn per se) vertical exclusivity; it

-10-

is enough to say here that the incentives for and effects of

such arrangements are usually more benign than a horizontal

arrangement among competitors that none of them will supply a

company that deals with one of their competitors. No one

would think twice about a doctor agreeing to work full time

for a staff HMO, an extreme case of vertical exclusivity.

Imagine, by contrast, the motives and effects of a horizontal

agreement by all of the doctors in a town not to work at a

hospital that serves a staff HMO which competes with the

doctors.

In this case, the exclusivity arrangements challenged by

U.S. Healthcare are vertical in form, that is, they comprise

individual promises to Healthsource made by each doctor

selecting the option not to offer his or her services to

another HMO. The closest that U.S. Healthcare gets to a

possible horizontal case is this: it suggests that the

exclusivity clause in question, although vertical in form, is

in substance an implicit horizontal agreement by the doctors

involved. U.S. Healthcare appears to argue that stockholder-

doctors dominate Healthsource and, in order to protect their

individual interests (as stockholders in Healthsource), they

agreed (in their capacity as doctors) not to deal with any

other HMO that might compete with Healthsource. We agree

that such a horizontal arrangement, if devoid of joint

venture efficiencies, might warrant per se condemnation.

-11-

The difficulty is that there is no evidence of such a

horizontal agreement in this case. Although U.S. Healthcare

notes that doctor-stockholders predominate on the

Healthsource board that adopted the option, there is nothing

to show that the clause was devised or encouraged by the

panel doctors. On the contrary, the record indicates that

Dr. Payson and Healthsource's chief operating officer

developed the option to serve Healthsource's own interests.

Formally vertical arrangements used to disguise horizontal

ones are not unknown, see Interstate Circuit, Inc. v. United

States, 306 U.S. 208 (1939), but U.S. Healthcare has supplied

us with no evidence of such a masquerade in this case.

There is less to be said for U.S. Healthcare's

alternative argument that, if per se treatment is not proper,

then at least the exclusivity clause can be condemned almost

as swiftly based on "a quick look." Citing FTC v. Indiana

Federation of Dentists, 476 U.S. 447 (1986), and NCAA v.

Board of Regents, 468 U.S. 85 (1984), U.S. Healthcare argues

that the exclusivity clause is so patently bad that even a

brief glance at its impact, lack of business benefit and

anticompetitive intent suffice to condemn it. The cases

relied on provide little help to U.S. Healthcare and, even

on its own version of those cases, the facts would not

conceivably justify a "quick look" condemnation of the

clause.

-12-

In the cited cases, the Supreme Court actually

contracted the per se rule by refusing to apply it to

horizontal agreements that involved price and output fixing

(television rights by NCAA members) or the setting of other

terms of trade (refusal of dentists by agreement to provide

x-rays to insurers). Given the unusual contexts (an

interdependent sports league in one case; medical care in the

other), the Court declined to condemn the arrangements per

se, without at least weighing the alleged justifications. At

the same time it required only the briefest inspection (the

cited "quick look") for the Court to reject the excuses and

strike down the agreements. Accord, National Society of

Professional Engineers v. United States, 435 U.S. 679 (1978).

In any event, no "quick look" would ever suffice to

condemn the exclusivity clause at issue in this case.

Exclusive dealing arrangements come with the imprimatur of

two leading Supreme Court decisions describing the potential

virtues of such arrangements. Tampa; Standard Oil Co. of

California v. United States, 337 U.S. 293 (1949) (Standard

Stations); see also Jefferson Parish Hospital District No. 2

v. Hyde, 466 U.S. 2, 46 (1984) (O'Connor, J., concurring).

To condemn such arrangements after Tampa requires a detailed

depiction of circumstances and the most careful weighing of

alleged dangers and potential benefits, which is to say the

-13-

normal treatment afforded by the rule of reason. To that

subject we now turn.

Rule of Reason. Exclusive dealing arrangements, like

information exchanges or standard settings, come in a variety

of forms and serve a range of objectives. Many of the

purposes are benign, such as assurance of supply or outlets,

enhanced ability to plan, reduced transaction costs, creation

of dealer loyalty, and the like. See Standard Stations, 337

U.S. at 307. But there is one common danger for competition:

an exclusive arrangement may "foreclose" so much of the

available supply or outlet capacity that existing competitors

or new entrants may be limited or excluded and, under certain

circumstances, this may reinforce market power and raise

prices for consumers.

Although the Supreme Court once said that a

"substantial" percentage foreclosure of suppliers or outlets

would violate section 1, Standard Stations, the Court's Tampa

decision effectively replaced any such quantitative test by

an open-ended inquiry into competitive impact. What is

required under Tampa is to determine "the probable effect of

the [exclusive] contract on the relevant area of effective

competition, taking into account . . . . [various factors

including] the probable immediate and future effects which

pre-emption of that share of the market might have on

effective competition therein." 365 U.S. at 329. The lower

-14-

courts have followed Tampa and under this standard judgments

for plaintiffs are not easily obtained. See ABA Antitrust

Section, Antitrust Law Developments 172-73, 176-78 (3d ed.

1992) (collecting cases).

On this appeal we are handicapped in appraising the

extent and impact of the foreclosure wrought by Healthsource

because U.S. Healthcare has not chosen to present its

argument in these traditional terms. Tampa is not even cited

in the opening or reply briefs. Some useful facts pertaining

to the extent of the foreclosure are adverted to in U.S.

Healthcare's opening "statement of the case" but never

seriously developed in the argument section of its brief.

Since the brief itself also describes countervailing evidence

of Healthsource, something more is assuredly needed. In the

two paragraphs of its "quick look" formulation addressed to

"anticompetitive impact," U.S. Healthcare simply asserts that

competitive impact has already been discussed and that the

exclusivity clause has completely foreclosed U.S. Healthcare

and any other non-staff HMO from operation in New Hampshire.

This is not a persuasive treatment of a difficult issue

or, rather, a host of issues. First, the extent to which the

clause operated economically to restrict doctors is a serious

question.3 True, most doctors signed up for it; but who

3Even with no notice period, Healthsource's differential
pricing policy--paying more to those who exclusively serve
Healthsource--would disadvantage competing HMOs. Some courts

-15-

would not take the extra compensation when no competing non-

staff HMO was yet operating? The extent of the financial

incentive to remain in an exclusive status is unclear, since

it varies with patient load, and the least loaded (and thus

least constrained by the clause) doctors would normally be

the best candidates for a competing HMO. Healthsource

suggests that by relatively modest amounts, U.S. Healthcare

could offset the exclusivity bonus for a substantial number

of Healthsource doctors. U.S. Healthcare's reply brief

offers no response.

Second, along with the economic inducement is the issue

of duration. Normally an exclusivity clause terminable on 30

days' notice would be close to a de minimus constraint (Tampa

involved a 20-year contract, and one year is sometimes taken

as the trigger for close scrutiny). On the other hand, it

may be that the original 180-day clause did frustrate U.S.

Healthcare's initial efforts to enlist panel doctors, without

whom it would be hard to sign up employers. Perhaps even a

30-day clause would have this effect, especially if a

reimbursement penalty were visited on doctors switching back

to non-exclusive status. Once again, U.S. Healthcare's brief

offers conclusions and a few record references, but neither

hesitate to apply the exclusivity label to such arrangements
because there is no continuing promise not to deal (see
Antitrust Developments, supra, at 176), but the differential

pricing plan is unquestionably part of a contract and so
subject to section 1, whatever label may be applied.

-16-

the precise operation of the clause nor its effects on

individual doctors are clearly settled.

Third, even assuming that the financial incentive and

duration of the exclusivity clause did remove many of the

Healthsource doctors from the reach of new HMOs, it is

unclear how much this foreclosure impairs the ability of new

HMOs to operate. Certainly the number of primary care

physicians tied to Healthsource was significant--one figure

suggested is 25 percent or more of all such primary care

physicians in New Hampshire--but this still leaves a much

larger number not tied to Healthsource. It may be, as U.S.

Healthcare urges, that many of the remaining "available"

doctors cannot fairly be counted (e.g., those employed full

time elsewhere, or reaching retirement, or unwilling to serve

HMOs at all). But the dimensions of this limitation were

disputed and, by the same token, new doctors are constantly

entering the market with an immediate need for patients.

U.S. Healthcare lays great stress upon claims, supported

by some meeting notes of Healthsource staff members, that the

latter was aware of new HMO entry and conscious that new HMOs

like U.S. Healthcare could be adversely affected by the

exclusivity clause.4 Healthsource in turn says that these

4Two examples of these staff notes give their flavor:
"Looking at '90 rates - and a deterent [sic] to joining other
HMOs (like Healthcare)"; and "amend contract (sending this or
next week) based on exclusivity. HMOs only (careful about
restraint of trade) will be sent to even those in Healthcare

-17-

were notes made in the absence of policy-making officers and

that its real motivation for the clause was to bolster

loyalty and cost-cutting incentives. Motive can, of course,

be a guide to expected effects, but effects are still the

central concern of the antitrust laws, and motive is mainly a

clue, see Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d

227 (1st Cir. 1983). This case itself suggests how far

motives in business arrangement may be mixed, ambiguous, and

subject to dispute. In any event, under Tampa the ultimate

issue in exclusivity cases remains the issue of foreclosure

and its consequences.

Absent a compelling showing of foreclosure of

substantial dimensions, we think there is no need for us to

pursue any inquiry into Healthsource's precise motives for

the clause, the existence and measure of any claimed benefits

from exclusivity, the balance between harms and benefits, or

the possible existence and relevance of any less restrictive

means of achieving the benefits. We are similarly spared the

difficulty of assessing the fact that the clause is limited

to HMOs, a fact from which more than one inference may be

drawn. The point is that proof of substantial foreclosure

and of "probable immediate and future effects" is the

essential basis under Tampa for an attack on an exclusivity

clause. U.S. Healthcare has not supplied that basis.

already . . . ."

-18-

In formal terms U.S. Healthcare has preserved on appeal

its claim that the exclusivity clause unreasonably restrains

competition in violation of section 1. That concept is

embraced by its complaint, and the limited depiction of

evidence in its appellate briefs stirs curiosity, if not

suspicion. But putting to one side its per se claims and

alleged market definition errors, U.S. Healthcare's basic

argument in this court must be that the evidence compelled

the magistrate judge to find substantial foreclosure having

an unreasonable adverse effect on competition. U.S.

Healthcare, as plaintiff at trial and appellant in this

court, had the burden of fully mustering the facts and

applying the analysis to establish such a claim. It has not

done so.

In this discussion, we have placed little weight upon

the formal finding of the magistrate judge that "the

[exclusivity] restriction does not constitute an unreasonable

restraint of trade under Section 1 of the Sherman Act." His

finding rested primarily on the premise that whatever the

impact of the clause on HMOs, ample competition remains in a

properly defined market, which he found to be one embracing

all health care offered throughout the state of New

Hampshire.5 On this view of the antitrust laws, it does not

5On the other hand, we do not accept U.S. Healthcare's
effort to salvage something from the decision by arguing the
magistrate judge found substantial foreclosure in fact. For

-19-

matter whether substantial foreclosure of new entrants occurs

so long as widespread competition prevails in the relevant

market, thereby protecting consumers.6

Whether the law requires such a further showing of

likely impact on consumers is open to debate. Our own case

law is not crystal clear on this issue. Compare Interface

Group, Inc. v. Mass Port Authority, 816 F.2d 9, 11 (1st Cir.

1981), with Corey v. Look, 641 F.2d at 36. Ultimately the

issue turns upon antitrust policy, where a permanent tension

prevails between the "no sparrow shall fall" concept of

antitrust, see Klor's, 359 U.S. at 213 (violation "not to be

tolerated merely because the victim is just one merchant

whose business is so small that his destruction makes little

difference to the economy"), and the ascendant view that

antitrust protects "competition, not competitors". See

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488

(1977). We need not confront this issue in a case where the

cardinal requirement of a valid claim--significant

foreclosure unreasonably restricting competitors--has not

been demonstrated.

the most part, the statements to which it points appear to us
to be efforts by the magistrate judge to describe the

allegations made by U.S. Healthcare.

6See, e.g., Dep't of Justice Merger Guidelines, 4.21,

4.213, June 14, 1984, 49 Fed. Reg. 26824, 26835-36 (1984),
adopting this position. The 1992 DOJ-FTC guidelines are
directed only to horizontal mergers and do not address the
issue. 49 Fed. Reg. 26823 (1992).

-20-

Section 2. Exclusive contracts might in some situations

constitute the wrongful act that is an ingredient in

monopolization claims under section 2. See United Shoe

Machinery Corp. The magistrate judge resolved these section

2 claims in favor of Healthsource primarily by defining the

market broadly to include all health care financing in New

Hampshire. So defined, Healthsource had a share of that

market too small to support an attempt charge, let alone one

of actual monopolization. U.S. Healthcare argues, however,

that the market was misdefined.

It may be unnecessary to consider this claim since, as

we have already held, U.S. Healthcare has failed to show a

substantial foreclosure effect from the exclusivity clause.

After all, an act can be wrongful in the context of section 2

only where it has or threatens to have a significant

exclusionary impact. But a lesser showing of likely effect

might be required if the actor were a monopolist or one

within striking distance. Compare Berkey Photo Inc. v.

Eastman Kodak Co., 603 F.2d 263, 272 (2d Cir. 1979), cert.

denied, 444 U.S. 1093 (1980). More important, the magistrate

judge dismissed the section 2 claims based on market

definition and, if his definition were shown to be wrong, a

remand might be required unless we were certain that U.S.

Healthcare could never prevail.

-21-

There is no subject in antitrust law more confusing than

market definition. One reason is that the concept, even in

the pristine formulation of economists, is deliberately an

attempt to oversimplify--for working purposes--the very

complex economic interactions between a number of differently

situated buyers and sellers, each of whom in reality has

different costs, needs, and substitutes. See United States

v. E.I. du Pont De Nemours & Co, 351 U.S. 377 (1956).

Further, when lawyers and judges take hold of the concept,

they impose on it nuances and formulas that reflect

administrative and antitrust policy goals. This adaption is

legitimate (economists have no patent on the concept), but it

means that normative and descriptive ideas become intertwined

in the process of market definition.

Nevertheless, rational treatment is assisted by

remembering to ask, in defining the market, why we are doing

so: that is, what is the antitrust question in this case that

market definition aims to answer? This threshold inquiry

helps resolve U.S. Healthcare's claim that the magistrate

judge erred at the outset by directing his analysis to the

issue whether HMOs or health care financing was the relevant

product market. This approach, says U.S. Healthcare,

mistakenly focuses on the sale of health care to buyers

whereas its concern is Healthsource's buying power in tying

up doctors needed by other HMOs in order to compete.

-22-

The magistrate judge's approach was correct. One can

monopolize a product as either a seller or a buyer; but as a

buyer of doctor services, Healthsource could never achieve a

monopoly (monopsony is the technical term), because doctors

have too many alternative buyers for their services.7

Rather, the only way to cast Healthsource as a monopolist is

to argue, as U.S. Healthcare apparently did, that HMO

services (or even IPA HMOs) are a separate health care

product sold to consumers such as employers and employees.

If so, it might become possible (depending on market share

and other factors) to describe Healthsource as a monopolist

or potential monopolist in the sale of HMO (or IPA HMO)

services in New Hampshire, using the exclusionary clause to

foster or reinforce the monopoly.

Thus, the magistrate judge asked the right question.

Even so U.S. Healthcare argues that he gave the wrong answer

in finding that HMOs were not a separate market (it uses the

phrase "submarket" but this does not alter the issue). This

is a legitimate contention and U.S. Healthcare has at least

7U.S. Healthcare, of course, is not concerned with
Healthsource's ability as a monopsonist to exploit doctors;
it is concerned with its own ability to find doctors to serve
it. The latter question--one of foreclosure--depends on the
available supply of doctors, the constraint imposed by the
exclusivity clause, the prospect for entry of new doctors
into the market, and similar issues. Whether U.S. Healthcare
is foreclosed, however, does not depend on whether consumers
treat HMOs as a part of health care financing or as a unique
and separate product.

-23-

some basis for it: HMOs are often cheaper than other care

methods because they emphasize illness prevention and severe

cost control. U.S. Healthcare also seeks to distinguish

cases defining a broader "health care financing market"--

cases heavily relied on by the magistrate judge--as involving

quite different types of antitrust claims. See, e.g., Ball

Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc., 784 F.2d

1325 (7th Cir. 1986). Once again, we agree that the nature

of the claim can affect the proper market definition.

The problem with U.S. Healthcare's argument is that

differences in cost and quality between products create the

possibility of separate markets, not the certainty. A car

with more features and a higher price is, within some range,

in the same market as one with less features and a lower

price. The issue is sometimes described as one of

interchangeability of products or services, see duPont

(discussing cross-elasticity of demand), although this

formula is itself only an aid in trying to infer the shape of

the invisible demand curve facing the accused monopolist. In

practice, the frustrating but routine question how to define

the product market is answered in antitrust cases by asking

expert economists to testify. Here, the issue for an

economist would be whether a sole supplier of HMO services

(or IPA HMOs if that is U.S. Healthcare's proposed market)

could raise price far enough over cost, and for a long enough

-24-

period, to enjoy monopoly profits. Usage patterns, customer

surveys, actual profit levels, comparison of features, ease

of entry, and many other facts are pertinent in answering the

question.

Once again, U.S. Healthcare has not made its case in

this court. The (unquantified) cost advantage of HMOs is the

only important fact supplied; consumers might, or might not,

regard this benefit as just about offset by the limits placed

on the patient's choice of doctors. To be sure, there was

some expert testimony in the district court on both sides of

the market definition issue. But if there is any case in

which counsel has the obligation to cull the record, organize

the facts, and present them in the framework of a persuasive

legal argument, it is a sophisticated antitrust case like

this one. Without such a showing on appeal, we have limited

ability to reconstruct so complex a record ourselves and no

basis for overturning the magistrate judge.

Absent the showing of a properly defined product market

in which Healthsource could approach monopoly size, we have

no reason to consider the geographic dimension of the market.

If health care financing is the product market, as the

magistrate judge determined, plainly Healthsource has no

monopoly or anything close to it, given the number of other

providers in New Hampshire, such as insurers, staff HMOs,

Blue Cross/Blue Shield and individual doctors. This is

-25-

equally so whether the geographic market is southern New

Hampshire (as U.S. Healthcare claims) or the whole state (as

the magistrate judge found).

III. CONCLUSION

Once the federal antitrust claims are found wanting,

this appeal is resolved. U.S. Healthcare offers no authority

to suggest that New Hampshire antitrust law diverges from

federal law; indeed, the state statute encourages a uniform

construction. N.H. Rev. Stat. Ann. 356:14. As for the

state tort-law claims, primarily interference with potential

contractual relationships, the magistrate judge dealt

effectively with them, and U.S. Healthcare says little on

appeal to undercut his dismissal of those counts. Given the

arguments made and the record evidence arrayed in this court,

affirmance of the magistrate judge's judgment on all counts

is clearly in order.

Nevertheless, we do not think that this case was

inherently frivolous. The timing and original 180-day reach

of the exclusivity clause could reasonably excite suspicion;

the clause may have some impact though the extent of that

impact remains unclear; and the motives of Healthsource in

adopting the clause may well have been mixed. Competition

remains an essential force in controlling costs and improving

quality in health care. Courts are properly available to

settle claims that one business device or another is

-26-

unlawfully suppressing competition in this vital industry.

Although U.S. Healthcare's per se shortcut has taken it to a

dead end, we have addressed the antitrust issues at such

length precisely because of the importance of the subject.

Affirmed.

-27-